UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| MICHELLE PEELER, on behalf of herself and all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 1:23-CV-23-SNLJ |
| SRG GLOBAL COATINGS, LLC, et al., | ) ) ) |
| Defendants. | ) ) ) ) ) |

**MEMORANDUM and ORDER**

Plaintiff initially filed this putative class action against defendant SRG Global Coatings, LLC ("SRG") in February 2023. Plaintiffs filed a second amended complaint [Doc. 47] in April 2024 that added several defendants, including defendants 3M Company and Atotech USA, LLC. This matter is before the Court on 3M's and Atotech's separately-filed motions to dismiss [Doc. 79, Doc. 113]. Because these motions largely make the same arguments, the Court addresses them together.

**I.    Background**

For the purposes of the pending motion to dismiss, the facts alleged in the complaint are accepted as true. Plaintiffs' complaint alleges injuries and damages resulting from the "migration of hazardous carcinogenic chemicals" and "metals" from defendant SRG's manufacturing facilities in Portageville, Missouri, including hexavalent chromium, chromium, arsenic, PFAS, and nickel, as well as other hazardous chemicals

and metals. [Doc. 47 at ¶¶ 1-2, 32, et seq.] Specifically, plaintiffs alleged that "Defendant SRG failed to adequately prevent migration of the contaminated groundwater plume from the SRG site into the aquifer under Portageville, Missouri, that caused dangerous pollutants to enter the drinking water of Portageville residents." [*Id*. at ¶ 107(d).]

Defendant SRG's wastewater allegedly contained hexavalent chromium, as well as perfluorooctane sulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA"), two chemicals from a larger family known collectively as per- and polyfluoroalkyl substances ("PFAS"). SRG allegedly used PFOS- and PFOA-containing products it purchased from defendant Atotech USA, LLC ("Atotech") to suppress hazardous fumes in its manufacturing processes. The complaint alleges that PFOS, PFOA, and hexavalent chromium seeped into the groundwater and eventually entered public and private water sources. Plaintiff Peeler seeks to recover for an alleged personal injury; the other plaintiffs seek property and medical-monitoring damages on behalf of two different putative classes.

Plaintiffs allege the electroplating facilities in Portageville have manufactured automotive products since 1969. SRG purchased the facilities in 2008. According to the complaint, before SRG purchased the facilities, SRG discovered "hazardous chemical and metal contamination" of groundwater and soil at the facilities. SRG "entered an agreement with the State of Missouri to . . . remediate" that contamination. From 2008 on, SRG allegedly began using products containing PFOS and PFOA to "suppress hazardous hexavalent chromium fumes in its manufacturing processes." [Doc. 47 ¶¶ 47–48, 82.]  Plaintiffs allege that, since 2008, SRG has known that hexavalent chromium, a

2

human carcinogen, was being released into the groundwater, but that SRG refused to repair "leaks" in its "drainage system" and continued capturing "wastewater" that contained PFOS, PFOA, and hexavalent chromium within that system. *Id.* ¶¶ 52–54, 107(e).  Plaintiffs allege SRG still uses "PFAS containing materials" in its operations, despite state regulators' contrary instructions, and that SRG has taken "no steps to remediate its" alleged releases. *Id.* ¶¶ 50, 55. Plaintiffs also state that SRG "withheld" information about the "nature and extent" of alleged "hazardous contamination." *Id.* ¶ 56.

Plaintiffs allege that SRG bought the "PFAS-containing chemicals" it used from defendant Atotech, which began manufacturing PFAS-containing electroplating products in 2006. Former defendant DuPont[1] is alleged to have supplied PFAS to Atotech, and 3M is alleged to have manufactured "raw" PFAS and "supplied PFAS to DuPont." *Id.* ¶¶ 61–62.  Plaintiffs do not specify which PFAS 3M supplied. *See id.* ¶ 37 (defining "PFAS" to include, without limit, "PFOS, PFOA, PFNA, PFHxS, and PFHpA"). DuPont allegedly manufactured PFOA until 2013. *Id.* ¶ 64. 3M also allegedly manufactured PFOA and "was the only known manufacturer of PFOS and PFHxS in the United States." *Id.* ¶¶ 59–60.

However, defendant 3M contends in its motion to dismiss that, in 2000, 3M announced a voluntary phase-out of the manufacture of PFOS and PFOA. EPA, *Perfluorooctanoic Acid (PFOA), Fluorinated Telomers; Request for Comment,*

---

[1] "DuPont" refers collectively to several defendants, namely E.I. du Pont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc.  DuPont was previously a defendant in this case but has been dismissed for lack of personal jurisdiction. [Doc. 111.]

3

*Solicitation of Interested Parties for Enforceable Consent Agreement Development, and Notice of Public Meeting*, 68 Fed. Reg. 18,626, 18,628 (Apr. 16, 2003); *see* Compl. ¶ 58. In 2000, 3M stopped manufacturing PFOS in the United States; 3M phased out production and sale of raw PFOS and PFOA by 2002. 68 Fed. Reg. at 18,628; *see also* Doc. 47 at ¶ 58 ("3M was the primary manufacturer of PFAS chemicals in the United States from the 1940s through the early 2000s.").

After 2002, "PFOS" and "PFOA" nevertheless could "still be . . . imported" from abroad. EPA, *Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctane-sulfonic Acid (PFOS) as CERCLA Hazardous Substances*, 89 Fed. Reg. 39,124, 39,140 (May 8, 2024).[2]

Plaintiffs allege that Atotech, DuPont, and 3M knew of the dangers of PFOS and PFOA and that SRB has continued to use PFAS-containing products despite warnings from state regulators and that SRG knew that its disposal practices—funneling wastewater into a leaky drainage system—"would cause an unreasonable risk of harm to Plaintiffs and others in" Portageville. *Id.* ¶ 50, 52-53, 105.

In late 2022, water samples revealed the presence of PFOS and PFOA in public and private water wells near the SRG facilities. In April 2024, plaintiffs filed the operative complaint against SRG, Atotech, DuPont, and 3M. One plaintiff, Michelle

---

[2] Defendant 3M urges this Court to "take judicial notice of publicly available reports," *Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*, 831 F.3d 961, 968 n.2 (8th Cir. 2016), and "government websites," *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 793 (8th Cir. 2016). Plaintiffs do not argue otherwise, and this Court will thus take judicial notice of those materials. Notably, the information conveyed in those materials do not conflict with the complaint.

4

Peeler, asserts she has ulcerative colitis, which she attributes to exposure to chemicals originating at SRG's facilities, including PFOS, PFOA, and hexavalent chromium. The remaining plaintiffs are landowners who allege no present physical injury and instead seek, for themselves and on behalf of two different putative classes, property and medical-monitoring damages based on alleged PFOS and PFOA contamination.

This Court granted DuPont's motion to dismiss for lack of personal jurisdiction. Defendants 3M and Atotech separately move to dismiss the claims against them—Count III for Strict Liability Design Defect, and Count IV for Negligence—under Federal Rule of Civil Procedure 12(b)(6) and 12(b)(1).

## II.   Legal Standard

To survive a motion to dismiss for lack of jurisdiction or for failure to state a claim, *see* Fed. R. Civ. P. 12(b)(1), (6), a complaint must "allege sufficient factual matter, accepted as true, to . . . satisf[y] the elements of Article III standing," *Hawse v. Page*, 7 F.4th 685, 688–89 (8th Cir. 2021), or to "'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In other words, a complaint's factual allegations must "support a reasonable and plausible inference" the plaintiff has "standing," *Hawse*, 7 F.4th at 688–89, and that "the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678.

The Court must "accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Cole v. Homier Dist. Co., Inc.*, 599 F.3d 856, 861 (8th Cir. 2010) (quoting *Coons v. Mineta*, 410 F.3d 1036, 1039 (8th Cir. 2005)). However, "[t]hreadbare recitals of the elements of a cause of

5

action, supported by mere conclusory statements," will not pass muster. *Iqbal*, 556 U.S. at 678.

### III. Discussion

Defendants 3M and Atotech make four arguments in favor of dismissal.

#### A. Causation

Defendants contend that both Counts against them should be dismissed based on lack of causation. Under fundamental principles of both standing and tort law, plaintiffs must plead and prove causation. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (standing); *Gebhardt v. Am. Honda Motor Co.*, 627 S.W.3d 37, 43 (Mo. Ct. App. 2021) (design defect); *Tharp v. St. Luke's Surgicenter-Lee's Summit, LLC*, 587 S.W.3d 647, 657 (Mo. 2019) (negligence). Causation has two elements: "actual and proximate cause." *Tharp*, 587 S.W.3d at 657. The defendants contend that plaintiffs fail to establish either actual cause or proximate cause.

##### 1. Actual cause

To establish actual cause, a plaintiff must adequately plead that "but for" the defendant's "conduct," the plaintiff would not "have been injured." *Tharp*, 587 S.W.3d at 657. "[W]here a plaintiff claims injury from a product, actual causation can be established only by identifying the defendant who made or sold that product." *City of St. Louis v. Benjamin Moore & Co.*, 226 S.W.3d 110, 115 (Mo. banc 2007). Establishing standing likewise requires demonstrating "traceability," which means showing that "each defendant 'likely caused'" "plaintiff's 'injury.'" *In re E. I. du Pont de Nemours & Co. C-*

6

*8 Pers. Inj. Litig.*, 87 F.4th 315, 320 (6th Cir. 2023) ("*DuPont*") (quoting *TransUnion*, 594 U.S. at 423).

The defendants 3M and Atotech argue that plaintiffs have not pleaded that they were the but-for cause of any injury.

First, defendants 3M and Atotech argue that the complaint fails to connect their products to any alleged contamination. Only two PFAS-type chemicals are alleged to contaminate the groundwater in Portageville: PFOS and PFOA. Although plaintiffs allege those chemicals come from discharges from SRG's manufacturing processes, plaintiffs also allege that SRG began using those chemicals in 2008, and that SRG obtained those chemicals from defendant Atotech. Atotech allegedly began making products containing those chemicals for use in the relevant industry in 2006. [*See* Doc. 47 at ¶¶ 47, 80, 82.] 3M contends that it cannot possibly be responsible for having provided the offending chemicals because it phased out raw PFOS and PFOA sales by 2002—a fact supported by the complaint's allegation that 3M manufactured PFAS "through the early 2000s." *Id.* at ¶ 58. Thus, 3M insists, there can be no plausible allegation that the PFAS allegedly used by SRG and allegedly present in Portageville's water came from 3M.

Second, defendants contend that it is not enough for the plaintiffs to simply allege that SRG used products designed, manufactured, and sold by Atotech and 3M. The complaint does allege that the products SRG used contained PFAS manufactured by 3M and Atotech. [Doc. 47 at ¶ 33.] Both defendants, however, argue that it is insufficient for plaintiffs to allege only that 3M "manufactured or otherwise distributed 'PFAS,'" to

7

support a plausible inference that they "bear responsibility for the particular PFAS" allegedly present here. *DuPont*, 87 F.4th at 321.  Defendants rely on the Sixth Circuit's ruling in *DuPont*, where the Sixth Circuit reversed a district court's class certification order involving the same family of chemicals.  The plaintiff was a firefighter who claimed he had traces of five PFAS-type chemicals in his bloodstream.  Plaintiff named ten companies as defendants and alleged "simply that these defendants manufactured or otherwise distributed 'PFAS'" without alleging that any one of them had actually "manufactured any of the five compounds" present in plaintiff's blood.  87 F.4th at 321. Further, plaintiff did not "allege any plausible pathway by which any of these defendants could have delivered any of these five PFAS to his bloodstream." *Id.*  The Sixth Circuit thus concluded that plaintiff had failed to meet the Supreme Court's pleading and traceability standards, and the district court was ordered to dismiss for lack of jurisdiction.  *Id.*

      Here, plaintiffs allege 3M stopped manufacturing PFAS in the early 2000s. Although 3M contends it is too great a leap to assume that Atotech—which did not start manufacturing chemicals containing PFAS until 2006 [Doc. 47 at ¶ 80]—used PFAS manufactured by 3M years before, 3M admits that even "it continued to use PFOA in the manufacturing process of some of its own unrelated fluoropolymer products until 2008." [Doc. 80 at 10 n.2.]  Plaintiffs urge this Court to follow a district court in Delaware in a similar case involving alleged water contamination from a Delaware electroplating facility. *Banks v. E.I. du Pont de Nemours and Company*, C.A. No. 19-1672-MN-JLH, 2022 WL 3139087 (D. Del. August 4, 2022).  Plaintiffs highlight that the district court in

*Banks* denied defendants' motion to dismiss despite the complaint's lack of detail; defendants there had argued plaintiffs should be "required to be more specific about the products at issue and the time frame of exposure." *Id.* at *7.

Ultimately, neither case is on point because neither addresses a disconnect in timing between 3M's manufacture of PFAS and another defendant's actual use of PFAS that it might have obtained indirectly from 3M through Atotech. *DuPont*'s plaintiff entirely failed to connect the PFAS in his blood to any chemical produced by any defendant, and the Sixth Circuit held he had not established causation. In *Banks*, the defendant electroplating facility was alleged to have been using PFAS at the same time 3M was manufacturing PFAS, and the district court denied defendants' motion to dismiss. 2022 WL 3139087, at *7.

Although plaintiffs here lack the *Banks* plaintiffs' timing, they do not make the *DuPont* plaintiff's mistake. Plaintiffs here do allege that 3M and Atotech "designed, manufactured, formulated, promoted, marketed and sold (directly and indirectly) PFAS products that were used in SRG's electroplating manufacturing processes." [Doc. 47 at ¶ 33.] Although thin, plaintiffs have pleaded what defendants 3M and Atotech deny—that those defendants manufactured and sold the chemicals SRG used that ultimately leeched into the plaintiffs' water source.

### 2. Failure to warn

Defendants' next causation-related argument pertains to plaintiffs' negligence claim. Count IV for negligence includes that defendants "failed to warn plaintiffs, SRG,

9

and the public regarding the hazards associated with their PFAS products." [Doc. 47 at ¶ 126a.] The elements of a claim for negligent failure to warn are

> (1) the defendant designed the product at issue; (2) the product did not contain an adequate warning of the alleged defect or hazard; (3) the defendant failed to use ordinary care to warn of the risk of harm from the alleged defect or hazard; and (4) as a direct result of the defendant's failure to adequately warn, the plaintiff sustained damage.

*Moore v. Ford Motor Co.*, 332 S.W.3d 749, 764 (Mo. *banc* 2011).

Defendant 3M argues that plaintiffs lack standing because they cannot establish the fourth element, which requires causation. That is, 3M says plaintiffs cannot show that "a warning [from 3M] would have altered" the "behavior" of the companies and individuals involved. *Menz v. New Holland N. Am., Inc.*, 507 F.3d 1107, 1111 (8th Cir. 2007). Both defendants suggest that plaintiffs allege their fellow defendants already knew the alleged dangers of PFOS, PFOA, and (in SRG's case) hexavalent chromium, thus vitiating plaintiffs' failure to warn claim. [Doc. 80 at 14 (citing Doc. 47 at ¶¶ 50, 72–78, 81, 105).] However, Missouri's presumption that an adequate warning will be heeded can be rebutted, but only if a jury can find a user did not know of the *specific* danger involved. *See Menz*, 507 F.3d at 1112 (emphasis added). It is not sufficient that the user knew only the *general* danger associated with the activity. *See DG&G, Inc. v. FlexSol Packaging Corp.*, 576 F.3d 820, 824 (8th Cir. 2009). Nothing in the pleadings suggests SRG knew, specifically, of PFAS discharges and their specific dangers earlier than 2020. [*See* Doc. 47 at ¶¶ 54-55.]

In addition, defendants contend, plaintiffs would have had no reason to act differently—for example, by switching water sources—even had 3M/Atotech issued a warning about the alleged dangers of PFOS or PFOA because plaintiffs allegedly "did not know" about the presence of those chemicals in their water "until late 2022." [Doc. 47 at ¶ 43.]  Again, Missouri law presumes an ordinary person would heed warnings and take precautions to avoid harm.  It is not entirely clear what sort of warning plaintiffs claim they were owed.  They appear to claim they were damaged because, had a warning been given to plaintiffs, the public, or SRG, then plaintiffs would have learned about the chemicals in their water supplier earlier. Plaintiffs' allegations, though again thin, are sufficient to withstand the motions to dismiss on this point.

Plaintiffs have adequately pleaded actual cause, and 3M and Atotech's motions to dismiss are denied on this point.

### 3. Proximate cause

"Proximate cause" requires that "'the injury must be a reasonable and probable consequence of the act or omission of the defendant.'" *Tharp*, 587 S.W.3d at 657. "[E]vents that are 'too far removed from the ultimate injury or damage' do not provide a basis for liability even if they" are but-for causes. *Id.* Proximate cause is lacking when there is a "superseding cause." *Tompkins v. Cervantes*, 917 S.W.2d 186, 191 (Mo. Ct. App. 1996). The negligent conduct of a third person that "eclipses the role the defendant's conduct played in the plaintiff's injury" is a "superseding cause" unless it was "'a foreseeable and natural product of the original'" act. *Id.* at 190–91. Courts hesitate to hold a defendant liable when there is an "attenuated . . . chain of causation"

11

over which the defendant lacked "control." *Finocchio v. Mahler*, 37 S.W.3d 300, 303–04 (Mo. Ct. App. 2000).

Defendants 3M and Atotech contend SRG's conscious failure to repair the leaks in its drainage system—and to continue to use the leaking system while employing chemicals like PFOS and PFOA—constitutes a superseding cause.  Moreover, they argue that plaintiffs allege no facts that would suggest the defendants should have foreseen SRG's willful refusal to employ proper safeguards.

"To find proximate cause, it is only necessary that [a defendant] knew or should have known that there was an appreciable chance some injury would result from their actions." *Vintila v. Drassen*, 52 S.W.3d 28, 40 (Mo. App. S.D. 2001) (citing *Robinson v. Missouri State Highway and Transp. Com'n*, 24 S.W.3d 67, 78 (Mo. App. W.D. 2000)). Plaintiffs have alleged facts that would support defendants' knowledge of such an "appreciable chance."  For example, "An internal memo from 1960 described 3M's understanding that [PFAS] wastes would eventually reach the water table and pollute domestic wells.  [Doc. 47 at ¶ 67.]  Plaintiffs have pleaded facts that, taken as true, establish SRG's use of the chemical and its subsequent escape into the environment was conceivably foreseeable by 3M and Atotech. Therefore, for purposes of this motion to dismiss, SRG's reasonably anticipated use of 3M/Atotech's PFAS chemicals was not a superseding cause sufficient to relieve those defendants of liability.

**B.    Design-defect claim and foreseeability**

A product's design is "deemed defective when it is shown that the way that the product has been designed renders it unreasonably dangerous." *Pree v. Brunswick Corp.*,

12

983 F.2d 863, 865 (8th Cir. 1993) (internal citations omitted). A third party can maintain an action against a manufacturer if the product was in an unreasonably dangerous condition when put to a foreseeable or "reasonably anticipated use" and causes injury. *Thompson v. Brown & Williamson Tobacco Corp.,* 207 S.W.3d 76, 97 (Mo. App. W.D. 2006).

Defendant 3M and Atotech contend that plaintiffs cannot state a claim against them because SRG's improper disposal of their PFAS products was not a foreseeable or reasonably anticipated use. The concept of reasonably anticipated use encompasses "'objectively foreseeable'" "misuse," such as "target shooting without hearing protection." *Chronister v. Bryco Arms*, 125 F.3d 624, 627 (8th Cir. 1997) (emphasis omitted). But, the defendants argue, liability cannot be imposed where the manufacturer could not have "reasonably anticipated" the product's misuse—for example, driving a "riding lawn mower" "with a child as a passenger." *Erkson ex rel. Hickman v. Sears, Roebuck & Co.*, 841 S.W.2d 207, 208, 210–11 (Mo. Ct. App. 1992). In the context of industrial products, use contrary to "industry standard[s]," or where the user was "'well aware'" of a use's "'shortcomings,'" is not "objectively foreseeable." *DG&G, Inc.*, 576 F.3d at 825. Defendants argue that, because plaintiffs allege SRG was well aware of its flawed waste-disposal practices, SRG's improper disposal of PFOS- and PFOA-containing wastewater was unforeseeable.

As already stated, plaintiffs have alleged that SRG used PFAS chemicals manufactured and sold to SRG by defendants "to suppress hazardous hexavalent chromium fumes in its manufacturing processes at the Portageville, Missouri facilities."

13

[Doc. 47 ¶¶ 47, 51.] The application of PFAS chemicals for the intended purpose of suppressing hexavalent chromium fumes involves direct contact with several surfaces within the electroplating or manufacturing processes that are regularly exposed to large volumes of liquid. Given how easily PFAS chemicals spread, plaintiffs argue, it was conceivably foreseeable that these chemicals would enter the drainage system and contaminate the environment. [*Id*. at ¶¶ 38-41.]

For purposes of the motion to dismiss, plaintiffs have adequately pleaded that it is conceivably foreseeable that an allegedly "unreasonably dangerous chemical"—one that is highly mobile through air, soil, and water, persistent in the environment, and not easily biodegradable—would escape SRG's manufacturing plant and contaminate the environment, causing injury.

Plaintiffs have adequately alleged foreseeability.

C.     **Negligence and duty**

Negligence claims like plaintiffs' here require "1) the existence of a duty on the part of the defendant to protect plaintiffs from injury; 2) failure of defendant to perform that duty; and 3) injury to plaintiffs resulting from such failure." *Hill v. Gen. Motors Corp.,* 637 S.W.2d 382, 384 (Mo. App. E.D.1982) (citing *Scheibel v. Hillis,* 531 S.W.2d 285, 288 (Mo. *banc* 1976)).  Whether a duty exists is a matter of law, and "[f]or purposes of determining whether a duty exists, [the Missouri Supreme Court] has defined foreseeability as the presence of some probability or likelihood of harm sufficiently serious that ordinary persons would take precautions to avoid it." *Lopez v. Three Rivers Elec. Co-op., Inc.,* 26 S.W.3d 151, 156 (Mo. *banc* 2000).

14

3M and Atotech contend that because they had no right or obligation to control the activities in question, that they did not owe plaintiffs a duty. But, as plaintiffs point out, both defendants ignore Missouri's adoption of § 388 of the Restatement (Second) of Torts, which provides

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

*Thompson,* 207 S.W.3d at 98-99 (citing *Morris v. Shell Oil Co.*, 467 S.W.2d 39, 42 (Mo. 1971); s*ee also* Mo. Approved Jury Instr. (Civil) 25.09, 25.10(A) (8th ed).  Defendants appear to concede that Section 388 does not require "control," but they maintain that the Restatement still supports dismissal because it requires defendant "know" that the product is "likely to be dangerous for the use for which it is supplied."  Restatement (Second) of Torts § 388.

Plaintiffs again rely on *Banks*, the Delaware case involving many of the same defendants and PFAS-contaminated drinking water. The *Banks* court also evaluated the element of duty under Section 388 with respect to negligence claims. 2022 WL 3139087 at *5-7. The *Banks* plaintiffs alleged that PFAS manufactured by 3M, Atotech, and

15

DuPont was discharged from the electroplating facility, contaminating their water supply. *Id*. The court found that plaintiffs had plausibly alleged that defendants supplied PFAO and PFOS to the electroplating facility, that they knew that their products would be used in the plating process which would generate PFAS-containing waste that would need to be disposed of, and that their PFAS products could contaminate the local water thereby endangering the health of those who drank from it. *Id*. at *5. The court held that these facts made it at least plausible that defendants did not provide an adequate warning. As such, the pleadings were deemed sufficient. *Id*.  3M and Atotech argue that the allegations in *Banks* are distinguishable from those here because, in *Banks*, the plaintiffs allege that PFAS were discharged during their intended use—not just (as here) that they were mishandled during disposal.

Regardless, plaintiffs here allege that defendant SRG used 3M and Atotech's PFAS products in a reasonably anticipated way, such that the defendants should have reasonably foreseen causing injury to plaintiffs. Accordingly, plaintiffs' pleaded facts, taken as true, establish that 3M and Atotech owed a duty to plaintiffs.

D.     **Medical-monitoring damages**

Plaintiffs allege that, as a result of exposure to PFOS and PFOA, they have "increased risk for latent diseases." [Doc. 47 at ¶¶ 2, 41.]  As a result, plaintiffs seek not only "groundwater remediation" and "home filters and plumbing replacements," but also future "medical monitoring."  [*Id.* ¶ 108.]

Defendants 3M and Atotech argue that plaintiffs lack Article III standing to bring claims for medical monitoring.  Defendant acknowledges that, under Missouri law,

16

"medical monitoring damages" do not require "a threshold showing of present physical injury"—a plaintiff can recover based on exposure that creates "'a significantly increased risk of contracting a particular disease relative to what would be the case in the absence of exposure.'" *Meyer ex rel. Coplin v. Fluor Corp.*, 220 S.W.3d 712, 718 (Mo. *banc* 2007) (quoting *Bower v. Westinghouse Elec. Corp.*, 522 S.E.2d 424, 433 (W. Va. 1999)). But defendants maintain that a relatively recent opinion from the Supreme Court of the United States forecloses standing for plaintiff's medical monitoring claim. *See TransUnion,* 594 U.S. at 436.

*TransUnion* states that Article III standing requires a present, "concrete harm" with a "close historical or common-law analogue." 594 U.S. at 424, 436. The Supreme Court held, "the mere risk of future harm" does not suffice where plaintiffs seek damages rather than injunctive relief. *TransUnion,* 594 U.S. at 436. The *TransUnion* plaintiffs claimed they were damaged by inaccurate information in their credit files maintained by the defendant; although the plaintiffs could not demonstrate that the "misleading information…itself constitutes a concrete harm," they argued it "exposed them to a material risk that the information would be disseminated in the future to third parties and thereby cause them harm." *Id.* at 435.  Court held that because there was no evidence that the inaccurate information in the credit files was ever provided to third parties; "because no evidence in the record establishes a serious likelihood of disclosure," the Court could not "simply presume a material risk of concrete harm" sufficient to support standing. *Id.* at 438.  The Court also pointed out that there was no evidence any of

17

plaintiffs even knew about the inaccurate credit file information, so there could be no claim for injury based on that knowledge. *Id.*

Courts appear split on whether medical monitoring claims go the way of the above-described *TransUnion* plaintiffs' standing arguments.  At least one court has noted that "medical monitoring claims face significant hurdles in establishing federal standing" where "the claim is premised on exposure without current symptomatic illness." *Sommerville v. Union Carbide Corp.*, No. 2:19-CV-00878, 2024 WL 2139394, at *8 (S.D.W. Va. May 13, 2024).  There, the court held that such a claim was "conjectural," and that although a "West Virginia state court may allow the cause of action to proceed, these allegations are not sufficient to confer federal standing."  *Id.*

Another court determined such plaintiffs had Article III standing, discussing *TransUnion* and noting plaintiffs "suffered a concrete, particularized, and actual or imminent injury-in-fact through chemical exposure, ... which allegedly creates severe health risks. This injury cannot be speculative, because it has already occurred." *Prantil v. Arkema France S.A.*, No. 4:17-CV-02960, 2022 WL 1570022, at *36 (S.D. Tex. May 18, 2022) (internal quotation omitted).

This Court holds that plaintiffs have standing to bring their medical monitoring claims.  This case is not so much like *TransUnion*'s fact pattern where inaccuracies in credit reports had not been sent out to third parties—it is more like the other *TransUnion* plaintiffs that <u>did</u> establish standing.  Those plaintiffs' inaccurate credit reports were published to third parties, and the Court held they had Article III standing to bring their claim for damages. 594 U.S. at 432. The Court likened the distinction between the two

18

groups of plaintiffs to a distinction important to defamation lawsuits: only "published" defamatory statements are actionable. *Id.* That is, if a defamatory letter is written but then hidden in a drawer, it "does not harm anyone." *Id.* at 432. Here, plaintiffs allege they have actually been exposed to harmful chemicals, and they seek to mitigate their harm by monitoring their health. *See Prantil*, 2022 WL 1570022 at *36. This is not unlike cases in which a data breach allowed a third party to access and distribute personal identifying information; at least one court held that "purported time and effort monitoring [credit/financial] accounts" as the result of such a data breach "can qualify as an injury to support Plaintiffs' claims." *Baldwin v. Nat'l W. Life Ins. Co.*, No. 2:21-CV-04066-WJE, 2021 WL 4206736, at *3 (W.D. Mo. Sept. 15, 2021).

Plaintiffs have adequately alleged standing under Article III.

Accordingly,

**IT IS HEREBY ORDERED** that defendant 3M's motion to dismiss [Doc. 79] and defendant Atotech's motion to dismiss [Doc. 113] are DENIED.

Dated this 30th day of October, 2024.

_____
STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE